UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DARREN PADILLA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| INSIGHT GLOBAL, LLC; MERCK & ) | Civil Action No.: 1:23-cv-420 |
| CO., INC.; and MERCK SHARP & ) | [Jury Trial Demanded] |
| DOHME LLC f/k/a MERCK SHARP & ) | |
| DOHME CORP. f/k/a MERCK & CO., ) | |
| INC. ) | |
| ) | |
| Defendants. ) | |

NOW COMES Plaintiff, Darren Padilla, by and through undersigned counsel, and complains against Defendants Insight Global, LLC, Merck & Co., Inc., and Merck Sharp & Dohme LLC f/k/a Merck Sharp & Dohme Corp. f/k/a Merck & Co., Inc. (collectively, "Defendants"), as follows:

## INTRODUCTION AND NATURE OF THE CASE

Plaintiff brings this action against Defendants for discrimination and retaliation based on the protected classes of race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981. Further, Plaintiff asserts that Defendants wrongfully discharged him in violation of North Carolina public policy. Plaintiff seeks all available remedies including but not limited to, compensatory, punitive, and liquidated damages, as well as available equitable relief pursuant to 42 U.S.C. § 2000e-5(f)-(k), 42 U.S.C. § 1981a, and as otherwise authorized pursuant to law.

## JURISDICTION

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for relief asserted herein arise under federal law, and under 28 U.S.C. § 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2. This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

3. This Court has personal jurisdiction over Defendants because they operate within the State of North Carolina and within this District.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

5. Plaintiff Darren Padilla ("Plaintiff" or "Mr. Padilla") is a citizen and resident of Durham County, North Carolina. Mr. Padilla, an Asian male, was employed by Defendants from approximately August 24, 2020 until Defendants terminated his employment on April 28, 2021. At all times relevant hereto, Plaintiff constituted an "employee" pursuant to all applicable statutes.

6. Defendant Insight Global, LLC ("Insight") is a foreign corporation organized and existing under the laws of the State of Delaware. Defendant Insight is authorized to do business in the State of North Carolina and maintains a registered office located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615. At all times relevant hereto, Defendant Insight has continuously employed at least 20 employees.

7. Defendant Merck Sharp & Dohme LLC ("MSD") is a foreign corporation organized and existing under the laws of the State of New Jersey. Defendant MSD is authorized

to do business in the State of North Carolina and maintains a registered office located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615. At all times relevant hereto, Defendant MSD has continuously employed at least 20 employees.

8. Defendant MSD has been authorized to do business in the State of North Carolina since approximately October 1981 and has, since that time, undergone numerous corporate mergers and name changes. Defendant MSD operated as "Merck & Co., Inc." from approximately October 1981 until it changed its corporate name to "Merck Sharp & Dohme Corp." in November 2009. In August 2012, the entity merged with "Schering Corporation" but continued to operate in North Carolina as "Merck Sharp & Dohme Corp.". In April 2022, the entity began operating as "Merck Sharp & Dohme LLC," the name under which it presently operates in the State of North Carolina.

9. Defendant Merck & Co., Inc. ("Merck & Co.") is a foreign corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at 126 East Lincoln Avenue, Rahway, New Jersey, 07065. At all times relevant hereto, Defendant Merck & Co. has continuously employed at least 20 employees.

10. Defendant Merck & Co. is the listed owner of the property located at 5325 Old Oxford Road, Durham, North Carolina 27712 (the "Plant"). Upon information and belief, Defendant MSD maintains and operates the Plant, jointly with and under the control of its parent company, Defendant Merck & Co. Upon further information and belief, Defendants Merck & Co. and MSD (collectively, "Merck" or "Merck Defendants") share joint responsibility for business decisions as they pertain to operation and staffing of the Plant.

11. Upon information and belief, at all times relevant to this Complaint, Insight and Merck maintained a contractual relationship under which Defendant Insight recruited and hired

3

employees to work for Merck on a contract or permanent basis. At all relevant times, all Defendants constituted an "employer" pursuant to all applicable statutes and legal standards.

12. At all relevant times, Defendants have continuously constituted an employer engaged in an industry affecting commerce in accordance with sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. Mr. Padilla signed and filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 23, 2021, naming both Defendants jointly. Subsequently, Mr. Padilla signed and filed an amended Charge of Discrimination against Defendant Insight, individually, on October 18, 2021, and against Merck, individually, on October 25, 2021. Each Charge of Discrimination alleged discrimination and retaliation in violation of Title VII.

14. The EEOC issued Mr. Padilla a Determination and Notice of Rights in connection with both Charges on February 19, 2023. The Notice of Rights indicated that Mr. Padilla had 90 days from receipt of the Notice within which to file a lawsuit.

15. Mr. Padilla complied with all deadlines related to the investigation of his formal administrative complaints.

16. All conditions precedent to the institution of this lawsuit have been fulfilled.

## FACTUAL ALLEGATIONS

17. Defendant Insight is a staffing services company that focuses on the information technology, accounting, engineering, and finance sectors. Insight regularly provides staffing services to its clients offices located across the United States and Canada, including an office

4

Case 1:23-cv-00420-CCE-LPA   Document 1   Filed 05/22/23   Page 4 of 17

located at 4208 Six Forks Road, Suite 840, Raleigh, North Carolina 27609. The Raleigh, North Carolina office was the office that hired Mr. Padilla to work for Insight's client, Merck.

18. Merck is a biopharmaceutical company focused on "deliver[ing] innovative health solutions that advance the prevention and treatment of diseases in people and animals." Merck maintains locations around the world including the manufacturing plant located at 5325 Old Oxford Road, Durham, North Carolina 27712 (the "Plant").

19. Insight hired Mr. Padilla to work for its client, Merck, at the Plant. Mr. Padilla was hired as a temporary Instrumentation Technician, and he hoped that Merck would ultimately hire him for that position permanently. As an Instrumentation Technician, Mr. Padilla inspected and maintained instruments Merck used in its manufacturing operations. Mr. Padilla excelled at his job, received positive performance evaluations, and was one of the few employees allowed to work independently with minimal supervision due to his excellent performance.

20. Rachel Padilla (no relation), an Insight recruiter, hired Mr. Padilla for the Merck position. At all times relevant hereto, Merck employee, Caleb Foust, a white male, supervised Mr. Padilla.

21. At all times relevant hereto, Merck and Insight shared joint responsibility for ensuring that Mr. Padilla's work environment was free of discrimination, harassment, and hostility, and that Mr. Padilla was protected from retaliation for reporting same. Nevertheless, Defendants failed to do so.

22. From nearly the beginning of his employment with Defendants, Mr. Padilla observed many employees on his team at Merck regularly discussing politics, religion, and current events. These discussions often included employees making demeaning comments about anyone who was not a Christian and demeaning comments about non-white people as well as frequent and

5

open use of offensive racial and ethnic slurs. The use of racial slurs and demeaning comments about black people made Mr. Padilla very uncomfortable, because he is an Asian man married to a black woman, with mixed-race children. Mr. Padilla tried to put his head down and just focus on his work.

23. In approximately January 2021, when Mr. Padilla could no longer bear his coworkers' derogatory comments, Mr. Padilla reported to his Insight recruiter, Rachael Padilla ("Rachel"), that other employees were talking about religion, politics, recent events, and making racist comments, which were making him very uncomfortable. One employee in particular, Andino Ward ("Ward"), discussed politics, religion, and other sensitive matters so excessively that, upon information and belief, other employees also felt uncomfortable working with him.

24. Mr. Padilla was hesitant to provide details to Defendants or to allow Defendants to investigate the situation, because he was still a temporary employee and he feared retaliation. Rachel told Mr. Padilla he should report the comments and discussions to Foust.

25. Mr. Padilla discussed his concerns with Ward in an attempt to reach an amicable solution with him. After the discussion, Mr. Padilla hoped all was resolved; however, nothing had been resolved.

26. While working, Mr. Padilla tried to avoid his coworkers and focus solely on his work. However, the hostility Mr. Padilla endured got worse.

27. On or about March 25, 2021, Mr. Padilla was watching a video on his mobile phone while he was working on a task, which Merck allowed. Ward approached Mr. Padilla and aggressively demanded Mr. Padilla lower the volume of his phone. Because Mr. Padilla did not want a confrontation with Ward, he merely continued to work.

6

28. The following day, Mr. Padilla approached Foust to ask whether he thought Merck planned to offer him a full-time position and, if so, what Foust thought the timeline might be. Surprisingly, Foust asked about the incident the day before between Ward and Mr. Padilla. Mr. Padilla responded truthfully and reported his concerns about Ward's behavior to Foust.

29. The next day, March 27, 2021, Mr. Padilla filed a complaint through Insight's EthicsPoint hotline regarding the hostility and racist comments and discussions. A few days later, on or about April 1, 2021, Mr. Padilla located the contact information for Merck's Human Resources department and filed a complaint with Merck regarding same.

30. After filing his complaints with Defendants, Defendants placed Mr. Padilla on *unpaid* leave, indicating that they would investigate his complaints. Mr. Padilla remained on unpaid leave for nearly four (4) weeks.

31. During Defendants' investigation, upon information and belief, numerous employees confirmed that Ward and other employees who worked with Mr. Padilla often discussed racist, political, polarizing, and religious issues, and made other employees uncomfortable.

32. On or about April 28, 2021, Merck ended Mr. Padilla's contract, terminating his placement at Merck.

33. Once Merck ended Mr. Padilla's placement, Insight never placed Mr. Padilla in new employment, again, effectively terminating its relationship with Mr. Padilla as well.

34. As set forth herein, Defendants intentionally discriminated and retaliated against Mr. Padilla because of his race, and because he complained about the hostile work environment to which he was subjected because of his race and/or religion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981.

35. As a direct, proximate, and reasonably foreseeable result of Defendants' unlawful discrimination and retaliation, Mr. Padilla suffered and continues to suffer damages. Defendants are jointly and severally liable to Mr. Padilla for all damages and remedies available to him under the law, including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, and attorneys' fees.

36. As a further direct, proximate, and reasonably foreseeable result of Defendants' unlawful discrimination and retaliation, Mr. Padilla has suffered and continues to suffer from anxiety, stress, and other mental and emotional damages, for which Defendants are responsible.

**FIRST CLAIM FOR RELIEF**
**Hostile Work Environment based on Race and Religion in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981**

37. Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if fully set forth herein.

38. Mr. Padilla was subjected to continuous unwelcome harassment by his coworker harassers on a daily basis.

39. Defendants' employees, including Ward, harassed Mr. Padilla by, including but not limited to:

    a. Engaging in loud discussions about politics, race, religion, and current events, which made Mr. Padilla and other coworkers very uncomfortable;

    b. Frequently using slurs against racial minorities;

    c. Watching political videos in the presence of employees such videos were highly likely to upset;

    d. Discussing religion in such a way that it was clear the employees involved believed Christians were superior to employees who practiced any other religion or who were not religious;

8

e. Frequently discussing race in the context of "whiteness" being superior to being black or another minority; and

f. In other ways to be determined through discovery.

40. Defendants' supervisory and managerial staff not only overheard Ward's comments and those made by other employees, but Mr. Padilla's direct supervisor, Foust, was part of the group who regularly engaged in these discussions.

41. Defendants' supervisory and managerial staff responsible for supervising Foust knew or should have known of the harassment Mr. Padilla was forced to endure on a daily basis, but failed to take any actions to stop it.

42. The harassment Mr. Padilla endured was unwelcome and he took actions to stop it, including but not limited to:

a. Reporting the harassment to Rachel, his Insight recruiter, in January 2021;

b. Attempting to discuss Ward's behavior with Ward directly, so Ward knew his behavior made Mr. Padilla and others uncomfortable, and to ask Ward to stop engaging in the inappropriate discussions;

c. Attempting to discuss Ward's behavior with Foust, so Foust knew the behavior made Mr. Padilla and others uncomfortable;

d. Filing a formal complaint with Insight through its EthicsPoint Hotline;

e. Filing a formal complaint with Merck through its Human Resources department; and

f. In other ways to be determined through discovery.

43. Said unwelcome harassment was subjectively sufficiently severe and pervasive that it altered the conditions of Mr. Padilla's employment and created an abusive work environment, which prompted him to report Ward's behavior to Defendants' EthicsPoint hotline and Human Resources department. Mr. Padilla specifically told Defendants' representatives that Ward's and Foust's behavior made him feel uncomfortable and unsafe.

9

44. Said unwelcome harassment was objectively sufficiently severe and pervasive in that a reasonable person could conclude so based on the frequency of the unwelcome harassment, its severity, and its humiliating impact upon Mr. Padilla, including but not limited to:

   a. The frequency with which Ward and other employees engaged in discussions about politics, race, religion, and current events – daily, if not several times per day;

   b. The frequency with which Ward and other employees used racial slurs meant to intimidate and harass non-white employees;

   c. The severity of Ward's aggression and hostility toward Mr. Padilla specifically, which only escalated after Mr. Padilla attempted to address his concerns directly with Ward in a professional manner;

   d. Mr. Padilla was made to feel uncomfortable, unsafe, and singled out; and

   e. The complaints Mr. Padilla made to Defendants' representatives yielded no recourse for Ward's or Foust's behavior, and instead, resulted in Mr. Padilla being placed on unpaid leave and ultimately terminated.

45. Defendants are jointly and severally liable to Mr. Padilla for the harassment he endured at the hands of his coworker harassers because Defendant had actual knowledge of the harassment and <u>failed to take any remedial action</u>. Defendants failed to properly supervise Foust to ensure that he was behaving appropriately and that he was addressing Mr. Padilla's and/or other employees' concerns in an appropriate manner. Further, Rachael insisted that Mr. Padilla relay his concerns to his supervisor, one of the people involved in the inappropriate behavior. When Mr. Padilla indicated he was uncomfortable doing so, Rachel made no attempt to assure Mr. Padilla he would be protected from retaliation or to encourage him to file a formal complaint. In fact, when Mr. Padilla ultimately did file a formal complaint, he was subjected to the very retaliation he feared, as set forth in greater detail below.

46. In addition, Defendants perpetuated the harassment and hostility by failing to conduct a proper investigation into Mr. Padilla's complaints, failing to take any disciplinary action

against Foust or Ward. Defendants ultimately terminated Ward's employment at the same time they terminated Mr. Padilla's employment. Defendants never took any disciplinary action against Ward for his behavior prior to firing both employees. Upon information and belief, Foust was never disciplined.

47. From January 2021 through April 2021, Defendants engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 1981. Specifically, Defendants subjected Mr. Padilla to a hostile work environment based on his race and religion.

48. Defendants acted intentionally, maliciously, and with reckless indifference to Mr. Padilla's federally protected right to be free from a hostile work environment based on his race and religion by failing to investigate his complaints, refusing to take any action to stop the harassment, and by perpetuating the hostile work environment as described hereinabove.

49. As a direct, proximate, and reasonably foreseeable result of Defendants' violations of Title VII and 42 U.S.C. § 1981 as described herein, Mr. Padilla has suffered and continues to suffer damages, including lost wages, lost benefits, emotional distress, pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

50. As a result of all of Defendants' acts and omissions as set forth herein, Defendants are jointly and severally liable to Mr. Padilla for all damages sustained due to Defendants' unlawful conduct including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

**SECOND CLAIM FOR RELIEF**
**Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981**

51. Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if fully set forth herein.

52. As an Asian male, Mr. Padilla is a member of a protected class, and thus satisfies this threshold requirement.

53. Prior to the adverse employment actions and retaliation described above, Mr. Padilla performed his duties satisfactorily and was not disciplined or warned by Defendants for any actions or inactions related to his employment. In fact, Mr. Padilla received positive performance reviews and was afforded special privileges based on his excellent performance.

54. Mr. Padilla worked for Defendants and used his phone in the same manner as Defendants' white and non-Asian employees for over seven (7) months, during which time he was never counseled or disciplined, or otherwise informed that his phone use was "disruptive."

55. Nevertheless, Defendants terminated Mr. Padilla's employment on April 28, 2021, and provided only an allegation of "disruptive" phone use as their justification for doing so, despite no prior warnings or disciplinary action for that behavior, and while allowing white and non-Asian employees to continue similar behavior without consequence.

56. By terminating Mr. Padilla's employment, Defendants, through their supervisory and managerial staff, acted intentionally, maliciously, and with reckless indifference to Mr. Padilla's federally protected right to be free from discrimination based on his race.

57. Defendants' conduct, by and through their supervisors and managers, deprived Mr. Padilla of equal employment because of his race.

58. As a direct, proximate, and reasonably foreseeable result of Defendants' violations of Title VII and 42 U.S.C. § 1981 as described herein, Mr. Padilla suffered and continues to suffer

damages, including but not limited to lost wages, emotional distress, and other non-pecuniary damages.

59. As a further direct, proximate, and reasonably foreseeable result of Defendants' acts and omissions as set forth herein, Defendants are jointly and severally liable to Mr. Padilla for all damages sustained due to being unlawfully terminated, and he is entitled to all remedies available to him as authorized by law, including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

### THIRD CLAIM FOR RELIEF
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981**

60. Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if fully set forth herein.

61. Shortly after Mr. Padilla complained to Defendants through Insight's EthicsPoint hotline and Merck's Human Resources department, Defendants placed Mr. Padilla on *unpaid* leave while they investigated his complaints.

62. Defendants had no reason to place Mr. Padilla on leave of any type, much less unpaid leave, after he filed his complaints. Importantly, no formal complaint was ever made to any Defendant regarding Mr. Padilla's own behavior, yet Defendants still chose to place Mr. Padilla on unpaid leave for nearly four (4) weeks.

63. Further, at the conclusion of their investigation into Mr. Padilla's complaints, Defendants terminated Mr. Padilla's employment, despite having no just cause for doing so. Defendants' proffered justification – specifically, that Mr. Padilla was terminated for using his mobile phone in a "disruptive" manner – is clearly a pretextual excuse. Mr. Padilla had never been counseled, warned, or disciplined for his phone use prior to the conclusion of Defendants'

13

investigation of his complaints against Ward. Further, Defendants did not similarly discipline other employees for the same behavior.

64. A causal connection exists between Mr. Padilla's complaints of discrimination and hostile work environment and his being placed on unpaid leave and subsequent termination based on the temporal proximity between his complaints of discrimination and hostility and the adverse employment action. Defendants placed Mr. Padilla on unpaid leave within days of his filing formal complaints and terminated him immediately upon the conclusion of such investigations, approximately four (4) weeks later.

65. Defendants, by and through its managerial and supervisory employees, retaliated against Mr. Padilla because he complained he was being harassed, discriminated against, and subjected to a hostile work environment based on his race and religion.

66. As a direct, proximate, and reasonably foreseeable result of Defendants' retaliation as described herein, Mr. Padilla has suffered and continues to suffer damages, including lost wages, emotional distress, pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

67. As a further direct, proximate, and reasonably foreseeable result of Defendants' retaliation and described herein, Mr. Padilla is entitled to recover all damages and remedies available pursuant to law, including, but not limited to, front pay, back pay, compensatory damages, punitive damages or liquidated damages, costs, attorneys' fees, etc.

## FOURTH CLAIM FOR RELIEF
### Wrongful Discharge in Violation of
### North Carolina Public Policy

68. Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if fully set forth herein.

69. As set forth herein, Defendants unlawfully discriminated and retaliated against Mr. Padilla because of his race and religion, in violation of Title VII and 42 U.S.C. § 1981. *See* Paragraphs 17-67, supra.

70. Additionally, Defendants' acts, as described hereinabove, contravene and violate the public policy of the State of North Carolina as set forth in North Carolina's Equal Employment Practices Act ("EEPA"). The EEPA declares that it is the public policy of this State to "protect and safeguard the right and opportunity of all persons to seek, obtain and *hold employment* without discrimination or abridgement on account of *race*…" *See* N.C. Gen. Stat. § 143-422.2 (emphasis added).

71. As set forth above, Defendants engaged in unlawful employment practices in violation of North Carolina law. Specifically, Defendants, through their supervisory and managerial staff, discriminated against Mr. Padilla by terminating him in retaliation for complaining about racial and religious harassment and hostile work environment he was forced to endure on a daily basis, thereby denying him the opportunity to "hold employment without discrimination…on account of race…" in violation of North Carolina public policy as codified in N.C. Gen. Stat. § 143-422.2. As a result, the retaliatory termination of Plaintiff constitutes wrongful discharge under North Carolina law.

72. Mr. Padilla's race, as well as his complaints about Defendants' discriminatory practices and hostile work environment, as described herein, were the direct, proximate, and foreseeable cause of, and/or a substantial factor in, Defendants' decision to terminate his employment.

73. Defendants' actions, as described hereinabove, violated the NCEEPA, among other statutes, and offended North Carolina's public policy of permitting employees to hold employment

without discrimination on account of race. Mr. Padilla was wrongfully terminated in violation of public policy because he opposed and complained about the discriminatory practices and hostile work environment cause and perpetuated by Defendants. Therefore, Mr. Padilla is entitled to compensation for lost wages, lost benefits, front pay, back pay, economic losses, and any other applicable damages pursuant to North Carolina law.

## **JURY DEMAND**

Plaintiff demands a trial by jury on the claims asserted in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the Court for judgment against Defendants to the full extent permitted by 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 2000e-5(f)-(k), and 42 U.S.C. § 1981a, including but not limited to, the following:

1. Judgment in Plaintiff's favor, determining that Defendant Insight's actions and conduct towards and relating to Plaintiff violated Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and North Carolina public policy;

2. Judgment in Plaintiff's favor, determining that Defendant MSD's actions and conduct towards and relating to Plaintiff violated Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and North Carolina public policy;

3. Judgment in Plaintiff's favor, determining that Defendant Merck & Co's actions and conduct towards and relating to Plaintiff violated Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and North Carolina public policy;

4. Award Plaintiff all monetary damages incurred, including but not limited to, back pay, front pay, interest, and benefits;

5. Award Plaintiff damages for mental anguish, emotional distress, and other non-pecuniary damages;

6. Award Plaintiff liquidated and/or punitive damages as a result of the intentional unlawful actions and conduct of Defendants under the Civil Rights Act of 1964 and the Civil Rights Act of 1991;

7. Award Plaintiff the costs, disbursements, expenses, reasonable attorneys' fees, and expert witness fees incurred by Plaintiff in filing and prosecuting this action pursuant to 42 U.S.C. § 1981a and/or as may be authorized by any other applicable federal and state laws;

8. For an award of pre- and post-judgment interest to Plaintiff on all damages; and

9. For all other, further relief as this Court deems just and appropriate.

This the 22nd day of May, 2023.

**GREEN MISTRETTA LAW, PLLC**

/s/ Dawn T. Mistretta
Dawn T. Mistretta, N.C. State Bar No. 31691
1752 Heritage Center Drive, Suite 101
Wake Forest, North Carolina 27587
Telephone: (919) 278-7453
Fax: (855) 876-8893
dmistretta@gmlawyers.org
*Counsel for Plaintiff*